1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - x
                              :
UNITED STATES OF AMERICA,     :   No. 3:09-cr-00154(SRU)
             Government,       :   915 Lafayette Boulevard
                              :   Bridgeport, Connecticut
         v.                   :
                              :
STEVEN LOPEZ,                 :   June 7, 2018
             Defendant.       :
                              :
- - - - - - - - - - - - - - - x

VIOLATION HEARING

B E F O R E:

     THE HONORABLE STEFAN R. UNDERHILL, U. S. D. J.

A P P E A R A N C E S:

     FOR THE GOVERNMENT:

          UNITED STATES ATTORNEY'S OFFICE
               450 Main Street, Room 328
               Hartford, Connecticut  06103
          BY:  JENNIFER LARAIA, AUSA

     FOR THE DEFENDANT:

          FEDERAL PUBLIC DEFENDER'S OFFICE
               10 Columbus Boulevard, 6th Floor
               Hartford, Connecticut  06106-1976
          BY:  ROSS DANIEL THOMAS, AFD

                Sharon L. Masse, RMR, CRR
                 Official Court Reporter
                 915 Lafayette Boulevard
               Bridgeport, Connecticut  06604
                   Tel: (860)937-4177

(Whereupon, proceedings commenced at 3:38 p.m.)

THE COURT:  Good afternoon.  We're here in the matter of United States v. Steven Lopez.  Could I have appearances, please.

MS. LARAIA:  Good afternoon, Your Honor. Jennifer Laraia for the United States.

THE COURT:  Thank you.  And Joe Zampano from Probation?

MR. ZAMPANO:  Yes, Your Honor.  I was going to wait until after Attorney Thomas.

THE COURT:  That's all right.

MR. THOMAS:  Good afternoon, Your Honor.  Ross Thomas from the Federal Public Defender's Office, on behalf of Steven Lopez, who is seated to my left.

THE COURT:  Very good.  Thank you.  We're here on a report of violation of supervised release.

Mr. Thomas, have you and Mr. Lopez seen the report prepared by Jane Cafone on or about May 31 and the associated recommendation?

MR. THOMAS:  We have, Your Honor.

THE COURT:  All right.  There's a single violation charged.

I guess maybe, Mr. Lopez, I should start by advising you of certain rights before we get into the details.

First, you have the right to remain silent. That means you don't have to say anything at all in court today.  Do you understand?

THE DEFENDANT:  Yes.

THE COURT:  Whatever you do say will be taken down for the record and can be used against you in this or some other case.  Do you understand?

THE DEFENDANT:  Yes.

THE COURT:  You have the right to counsel. That's why Mr. Thomas is here, to provide you with representation.  Do you understand?

THE DEFENDANT:  Yes.

THE COURT:  And you have the right to have a lawyer appointed for you at no cost if you cannot afford a lawyer.  Do you understand that?

THE DEFENDANT:  Yes, I do.

THE COURT:  All right.  And then whatever you and Mr. Thomas talk about privately will remain private as a result of something called the attorney-client privilege.  Okay?

THE DEFENDANT:  Yes.

THE COURT:  All right.  Any questions about any of that?

THE DEFENDANT:  No.

THE COURT:  All right.  And so you've seen the

report of violation that has the charge against you?

THE DEFENDANT:  Yes.

THE COURT:  Do you understand that the charge is that you violated mandatory condition of supervised release number one, that you not commit another federal, state or local offense?  Do you understand that charge?

THE DEFENDANT:  Yes.

THE COURT:  And do you understand the factual basis for it, which is set forth there?

THE DEFENDANT:  Yes, he read it to me.

THE COURT:  All right.  Now, if you either plead guilty or are found guilty of that charge, you face a maximum term of imprisonment of five years.  You face a Sentencing Guideline recommended range, there's some dispute about this, but it's either going to be 46 to 50 months of imprisonment or 18 to 24 months of imprisonment. And you face a term of supervised release, following any term of imprisonment, that's equal to five years less any term of imprisonment that's imposed.  All right?  Do you understand?

THE DEFENDANT:  I understand.

THE COURT:  All right.  Any questions about the potential penalties?

THE DEFENDANT:  I -- I comprehend it.

THE COURT:  All right.

Well, Mr. Thomas, how does Mr. Lopez want to proceed today?

MR. THOMAS:  We would like to plead to the violation and proceed to sentencing.

THE COURT:  Very well.  Okay.

Mr. Lopez, how do you plead to the charge that you violated mandatory condition number one?

THE DEFENDANT:  I plead guilty.

THE COURT:  All right.

Mr. Thomas, I have reviewed your sentencing memorandum and the various materials that you submitted, and I'd be happy to hear from you now with whatever argument you'd like to make about an appropriate sentence.

MR. THOMAS:  Thank you, Your Honor.  As you're aware, we're requesting a sentence of time served with no supervision to follow.  I laid out a couple reasons, but one of the reasons I will not focus here on today is the state sentences, and it's kind of complicated because there are quite a few at issue here.  We have both a new criminal charge, we have a special parole violation, and we have the supervised release violation.

So originally Mr. Lopez was arrested in I think June of 2017.  He bonded out of that case, but he went in on a special parole violation.  So that was what he was getting in custody to.

He recently entered an Alford plea to the charge at issue, and he was sentenced.  The sentencing date I believe was in May of 2018.  If you look on the judicial branch website or the DOC website, his release date is not until 2020.  The reason for that is that he was in, technically, Special Parole's custody, so none of that prior custody credit really transferred with him.  But he still awaits a special parole hearing where they can violate him just based on the finding of his Alford plea in state court and then impose whatever sentence.  They either can keep him in custody after he finishes serving the state sentence and re-parole him at any point up until 2025, which is his max hold date.  And even if they do decide to re-parole him, he will continue on special parole until 2025, where he will be supervised by a parole officer and subject to re-incarceration for very -- for any criminal offense but also minor infractions.

My understanding is it's much easier to go into custody on a special parole violation than either a violation of probation or violation of supervised release because the person making that determination is not a judge.  You're not necessarily afforded the opportunity for a lawyer.  It's really up to your individual parole officers to re-incarcerate you, and then you have a parole hearing where it's up to a parole board again where you

wouldn't necessarily have a lawyer.

I think the combination of having these state sentences imposes a severe enough sentence that we don't need to add additional punishment or any additional period of incarceration here today.

First and foremost, as to supervised release, the statute omits the considerations of seriousness of the offense, just punishment; and a number of Circuits have kind of looked at this and said that -- including the Second Circuit -- judges can consider these factors, but they are not required to because the primary purpose of supervision is really to kind of help facilitate people to doing well.

And the other two issues I do want to raise.  I guess before I get there, I do want to point out that any consecutive sentence conceivably could hold him well longer than 2025 because of the fact that special parole could keep him in custody.  A consecutive sentence really wouldn't start until both special parole and the new state sentence are sort of done and finished.

The other two arguments that I raised --

THE COURT:  The special parole sentence will be determined after this proceeding today?

MR. THOMAS:  That's correct, Your Honor.

THE COURT:  All right.  And, presumably, the

state judge can take into account what happens here.

MR. THOMAS:  The special parole board, yes.

THE COURT:  The special parole board, fine.

MR. THOMAS:  They could take that into consideration.  But, again, Mr. Lopez is not afforded a lawyer there.  He's not able to necessarily articulate all of those things.  He doesn't have an advocate on his behalf there to really kind of sit down and look at all these factors.  I think it's a very different proceeding than the one we find ourselves in today.

The other -- the other issue that I raised is that Mr. Lopez achieved a lot on supervision.  This is not someone that got out, didn't do anything, got caught and now is here again.  He made progress while he was in the BOP after he was originally sentenced.  I attached quite a number of certificates that he did.

As soon as he got out, his supervision didn't commence until like in July 2015, but he was out in about January of 2015 in a halfway house where he started working construction.  He had about two construction jobs, and he did very well in those.  He was working overtime. He was getting paid well.

In February 2016, unfortunately he got into a very severe car accident.  He was treated by a chiropractor for I think about six months.  Even the last

report, which I attached the excerpt of, indicated that he continues to suffer from pain, that it has not completely resolved.

So all of those things -- that car accident really prevented him from engaging in the type of work that kept him doing well.  He did, fortunately, decide to go back to school and get his cosmetology license.  He's, I think, 52 hours short of that.  He finished and passed like all of the exam portion of it or the theory part.  I think I attached his final exam scores to my sentencing memorandum.  But what he needs is 52 hours in order to -- of like practical training to actually be certified.  He only has a window of two years in which to do it.  I'm not exactly sure of all kind of the rules why, but what's been explained to me is that they put his education on a two-year leave, that is the longest that they could actually put him on leave, and that in order to actually get this license he would be -- he'd have to do those 52 hours of practical training.

Another thing that I did not include in my sentencing memorandum was that Mr. Lopez has been in contact, I believe his name is Nick, but who has reached out to him and let him know that he would have a job the second he got out, that he did great work, and that he would really be a valuable asset.

I think all of those things are important because a violation hearing is not just about the bad thing that you've done but all of the good things that you've achieved.  Progress doesn't always follow a linear path.  Sometimes, you know, there are steps backwards.  Unfortunately, there was a step backwards here, but I think he has developed a lot of skills that are going to enable him to do well in the future.

The third thing is mental and physical health.  Mr. Lopez suffers from PTSD.  He sought treatment while he was on supervised release, to his credit, and he has continued to engage in treatment at the DOC, both by taking medication and also engaging in therapy.  He finds this very helpful and allows him to kind of confront past traumas that he didn't really have a way of processing or dealing with.

As a part of that, he got put in a mental health unit, and I'm going to ask him to talk a little bit more about this, but it's both substance abuse and mental health.  One of the things that we really talked about was understanding why drug crimes are very dangerous for the community.  It is not a harmless offense.  And I think Mr. Lopez has really realized, seeing people confronting severe addiction issues and continuing on methadone and seeing how really like the dangers of it and how hard it

is for people and the struggles that they face, and that this is something he is sincerely remorseful and never wants to go back to.  But I will ask him to elaborate on that, and he's agreed to talk about it.

The other thing is his physical health.  He still continues to suffer from back pain, but most recently he has like a mass growing on his neck, and it's like it's difficult to see unless he goes down like this (indicating), but it's like the size of his fist.  It's very painful for him.  It's very painful at night.  I'm not a doctor, I don't know what he should be getting as treatment, but what I do know is he's being treated with Ibuprofen, and he's required to get Ibuprofen by going to the commissary to pay for it himself.  This seems to be something that needs to be treated by a doctor on the outside where you have medical options and the standard of care is not deliberate indifference.

And as far as additional supervision goes, I don't think it's necessary in light of the fact that he's going to be on supervision until 2025 in the event that he's released.  I don't think it would necessarily serve much of a purpose.  It seems to me that while he achieved some things, this is ultimately a little bit unsuccessful, and at a certain point adding supervision, incarceration, it becomes, you know, an almost a "gotcha" kind of thing,

and I don't think it would serve necessarily any beneficial purpose to add additional supervision.

Unless Your Honor has any questions, I'm happy to answer them, but Mr. Lopez would like to address the Court.

THE COURT:  Very well.  Mr. Lopez?

THE DEFENDANT:  Your Honor, also I wanted to state, elaborate a little bit more on the things that I've been going through.  So, basically, they have addiction services units in the prison where I was, so basically what I didn't do before when I was incarcerated was I never understand -- I never understood the user.  So I put myself in their position.  I did the addiction service program.  I got to really be around these people and see how they -- they move, and the medication that's given to these people, and basically the real effects of drugs and what they do to these people.  And I got to help a lot of these people in these programs.

I had a couple letters written from the counselors, and I didn't really understand what the effect -- the after-effects of being an addict till I see the mental issues that they go through, and the mental issues that I went through, because I didn't respect the fact that people or human beings, actual human beings just like me, I'm no better than them, and I got to be one on

one with these people, and I got to really understand them, and it broke me.

And I'm not saying that just because I'm like -- I have remorse on it now, because before when I was younger and I was growing up and I was dealing and doing the things I was doing, I didn't care.  I didn't have a conscience.  And even till this day when I was released from prison, I was struggling with a lot of things because of the time that I did, and it kind of like brought me back there because you come home, you expect things, and then you do good, and then things go bad for you.  I thought I was in the right track, and today I can honestly say that I messed up.

And I don't feel -- I feel like I owe it to myself, I owe it to you, I owe it to the courts, period, because I shouldn't be sitting here explaining myself for my negligence because I chose to make a mistake when I was on the right path.  So I'm dealing with a lot right now, and I see mental health, and they help me with it, but it's hard for me to like express it because it breaks me now because I really, really understand what these people go through.

And basically this past year, being incarcerated, I've been working on myself.  I've been getting in contact with people.  And basically I didn't

think people wanted to help me, and I see now that people were really seeing like the change.  They were like -- one of my friends was like, Look, I got work for you if you could come out.  What's going on with your situation?

I'm like, Well, I'm -- I'm -- it's not looking too good for me.

I contacted the schools.  They said, Look, we'll put you on a leave up to two years, because after that my loan goes into default and then basically I have to do everything from scratch.  So within the months coming up to this date, there's things that's like coming into my favor; but at the same time I don't know whether it'll be beneficial for me now or for the time that's coming because it's brought upon me at this moment.  So I don't know if it's something that -- just basically not a second chance but more like since I've been trying to fix myself personally and mentally, I feel like there's good things that try to basically come into effect with that to make you keep positive because, you know, being in jail, negative -- that negative lifestyle is hard to like juggle the positive and negative in this.  So I try to work on myself and stay positive.  And basically I feel like these things are a blessing, but at the same time I'm struggling with the ignorance that I dealt with bringing myself back into prison.

And, basically, I just wanted to elaborate a little more, like my physical condition also, because when I got into the car accident, I got more depressed. I end up having to seek treatment, and they were helping me with my situation, but I felt like -- it's like I got to a place in my life, and I felt like I was doing good, and then something was trying to like bring me back down. And she helped me with that. But there's a lot of stuff that I was trying to juggle within that time.

And then me coming back to prison, and the way they basically try to take care of you in there. Like now I found out I've got a fatty tumor in my neck and I need surgery. So they're telling me since the sentence that I took, I'll be out on the street soon, because supposedly they only see it as two years, but they don't know what is hanging over my head. They say, "Oh, you can take care of it when you go home." I seen people in prison with the same situation, have the same fatty tumor, and it looks crazy, like it's huge. You have to get surgery on it. They have to basically scrape it off the spine. And it's on my spinal cord. I could be crippled.

And I'm afraid for my life now in prison because I feel like even though I'm still pushing to do good, I feel like things are still trying to attack me and make me -- make me negative. But the pros out of it is that I

16

feel that I owe it to myself and all of 'ya to go out there and redeem myself by going home, staying -- finishing school, obtaining my license, because they have my license at the school, and I just have to finish the hours.  And given the opportunity to have a job waiting for me, and it's hard to get work out there at the moment -- I don't know about now because I haven't been out there lately -- I feel like things are just like trying to come right for me.  But me being in prison, it's like I feel like I failed.

Basically, I just wanted to just explain to you like what I've been going through this last year.  I appreciate your time.

THE COURT:  Okay, thank you.

Mr. Zampano, do you want to comment at all?  I know this is not really your case, but --

MR. ZAMPANO:  Yes, I've had the case just briefly, Your Honor.  But in reading what Officer Cafone has provided to the Court in terms of his state case, Mr. Lopez was sentenced on May 14 to possession with intent to sell or dispense, a Class U felony, and was sentenced to 731 days of jail.

According to the Bureau of Prisons website -- or, I'm sorry, the Department of Corrections website, and based on the information provided by Attorney Thomas,

apparently the defendant did bond out on these charges and is being held on the special parole. Therefore, he didn't receive any time towards this sentence. So his maximum release data, according to the Department of Corrections, would be May 12 of 2020, just for Your Honor's information, based on the current sentence.

In terms of the sentence being proposed by Probation, after reading the recommendation submitted by Officer Cafone, we would concur with her recommendation.

THE COURT: Okay.

MR. ZAMPANO: Thank you.

THE COURT: Thank you. Ms. Laraia?

MS. LARAIA: Yes, Your Honor. And this is not my case, I'm here for Attorney Vatti, but based on the communication I received from him and my review of the materials as well, the defendant was given a considerable chance when he was originally sentenced by Your Honor. He got 78 months. He could have received considerably longer than that period of time. And despite that break, he still picked up what appears to be a very serious case in the state court.

That doesn't demonstrate a serious commitment to changing one's lifestyle, particularly when a person has over his head a special parole and also a period of supervision from this Court.

18

The government's position is that a consecutive sentence is necessary here.  It's not excessively punitive.  It seems that there wouldn't be much of a point of having a potential sanction hanging over your head and a period of supervision if there wasn't a consequence just because you got a sentence in state court.  There has to be some consequence to violating the rules that this Court imposed, in addition to the rules that are set by state statute.

The government would ask that the Court impose a consecutive sentence and would leave the determination as to the length of that sentence to the Court's discretion.

THE COURT:  Okay.

Well, Mr. Lopez, let me say a couple things.  First off, I do think you made some good progress over the years, which really makes it almost more disappointing that you fell back into your old habits, you know?  I understand the car accident prevented you from being employed in the construction industry and tied you up; but it's a little frustrating, frankly, to see somebody who's got the ability and who's made progress fall back to old ways.

You've got, as you mentioned, you've got a number of convictions from your younger days, and it looked like you were maybe breaking free of that, and then

you're right back in it.  So I'm concerned about that, frankly, and I'll tell you, the Guideline range here, which I do think is correctly calculated as 46 to 57 months, we're not looking categorically at this conviction, we're looking at what did you do, and I think there's not much doubt that the arresting officer could come in and demonstrate that the drugs at issue are federal drugs.  I'm kind of making that point to your lawyer more than you maybe, but the point is that it is a serious violation, and it's one that I think merits some sanction here, frankly.

The principal things I'm concerned about, I always have to consider the Guidelines, which I have, but not surprisingly I think they're too high in this case again, but the factor that most concerns me here is deterrence.  The fact that you were making progress and then fell back, I think you need to, frankly, you need to serve a little time so that you're reminded that when you're on supervised release or, frankly, special parole, and you fall back to those old ways, it's going to be something you have to deal with.

So I am going to impose a term of imprisonment. I think that a term of one year, consecutive to your state sentence, is the appropriate sentence here.  It will add somewhat to the amount of time you have to be in prison,

but you'll be in a federal facility, which I think is going to be better for you.  You can get the healthcare you need there, perhaps even the surgery you need there, and I think that that sentence is the lowest sentence that I think is consistent with the appropriate factors in sentencing this matter today.

So I do not think that there's any period of supervised release that needs to follow that period, so I'm going to impose the one-year consecutive without any further term of supervised release.

And, frankly, I wish you good luck with the special parole folks.  I hope that this is the most that you do on this conduct.

Let me hear from either counsel if there's any reason why the sentence I just described cannot lawfully be imposed as the sentence of the Court in this case.

MS. LARAIA:  No, Your Honor.

MR. THOMAS:  No, Your Honor.

THE COURT:  All right.

Mr. Lopez, the sentence I described is imposed as the sentence in your case.  The judgment will be prepared soon, and that's going to start the clock running on your time to file a notice of appeal.  You have 14 days from the entry of the judgment within which to file a notice of appeal of your sentence.  Do you understand that

time limit?

THE DEFENDANT:  Fourteen days?

THE COURT:  Fourteen days.  Do you understand?

THE DEFENDANT:  Yes.

THE COURT:  Okay.  If you wish to appeal but you cannot afford to do so, you can file a motion to proceed in forma pauperis.  If that motion is granted, the Court will waive the filing fee for your appeal and will appoint a lawyer to handle your appeal at no cost to you.  Do you understand?

THE DEFENDANT:  Yes.

THE COURT:  Anything else we can do today?

MS. LARAIA:  No, Your Honor.

MR. ZAMPANO:  No, Your Honor.

MR. THOMAS:  No, Your Honor.

THE COURT:  Thank you all.  Mr. Lopez, good luck.  We'll stand in recess.

(Whereupon, the proceedings adjourned at 4:09 p.m.)

22

C E R T I F I C A T E

No. 3:09-cr-00154(SRU)
United States of America v. Steven Lopez


I, Sharon L. Masse, RMR, CRR, Official Court Reporter for the United States District Court for the District of Connecticut, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.


August 1, 2018


/S/ Sharon L. Masse
Sharon L. Masse, RMR, CRR
Official Court Reporter
915 Lafayette Boulevard
Bridgeport, Connecticut  06604
Tel: (860)937-4177